FILED

SEP 01 2026

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **BM318, LLC,** | § | **CASE NO. 20-42789-mxm11** |
| | § | |
| **Debtor.** | § | **CHAPTER 11** |

**STATUS REPORT OF TIMOTHY L. BARTON IN**
**<u>RESPONSE TO THE COURT'S AUGUST 27, 2026 STATUS REQUEST</u>**

**TO THE HONORABLE MARK X. MULLIN, UNITED STATES BANKRUPTCY JUDGE:**

Timothy L. Barton ("Barton"), appearing pro se solely in his individual capacity and not as counsel, manager, officer, or representative of BM318, LLC, respectfully submits this Status Report in response to the Courtroom Deputy's August 27, 2026 request for an update concerning this Chapter 11 case.

This filing addresses the present administration of BM318 under this Court's confirmed Plan. It does not ask the Court to reconsider the approval of the Dixon or Lumar settlements, disturb the final judgment in Adversary Proceeding No. 21-04051, or determine in this filing whether the Receivership's use of a centralized bank account was permissible or proper. The issue presented is whether the Receiver, who acted for BM318 and received settlement proceeds generated by BM318's preserved claims, has maintained and can provide a BM318-specific accounting showing how those proceeds were attributed and applied to BM318's obligations under the confirmed Plan and this Court's orders.

The record establishes that $175,000 of settlement consideration expressly payable to BM318 was deposited by the Receiver into the Main Receivership Account. The bankruptcy

docket, however, does not contain a BM318-specific ledger or reconciliation showing the treatment of that value after deposit, the distributions made on BM318 obligations, or the balance, if any, remaining attributable to BM318.

In response to the Court's August 27, 2026 status request, Barton respectfully submits that a verified BM318-specific reconciliation from the Receiver is necessary to state accurately the status of Plan implementation. That accounting also would provide the record necessary for any later determination under Bankruptcy Rule 3022 if a final decree is requested.

## I. CURRENT PROCEDURAL POSTURE

1. BM318 commenced this Chapter 11 case on September 1, 2020.

2. On August 2, 2021, this Court entered its Order Confirming Debtor's First Amended Plan of Reorganization, Dkt. 106, confirming Dkt. 39 as modified by Dkts. 79 and 100 (collectively, the "Plan").

3. Dkt. 106 found, among other things, that holders of Allowed Administrative Claims would be paid in full. Dkt. 106 at 2. The Confirmation Order further required BM318 to pay United States Trustee quarterly fees and file quarterly reports until the case is closed. Id. at 3.

4. After confirmation, BM318 commenced Adversary Proceeding No. 21-04051 against The Dixon Water Foundation ("Dixon"), asserting, among other matters, avoidance and recovery claims under 11 U.S.C. §§ 548 and 550.

5. On October 21, 2022, Receiver Cortney C. Thomas (the "Receiver") filed Dkt. 139, advising this Court that BM318 had been placed within the federal equity receivership in Securities and Exchange Commission v. Timothy Barton, et al., No. 3:22-cv-02118-X (N.D. Tex.) (the "Receivership Case").

6. The bankruptcy docket does not reflect the appointment of a Chapter 11 trustee for BM318. Subsequent proceedings, however, recognized that BM318 acted through the Receiver for purposes of the Dixon and Lumar settlements.

7. On May 28, 2024, this Court entered Dkts. 163 and 164 approving BM318's settlements with Dixon and Lumar Land & Cattle, LLC ("Lumar"). The Court later enforced those orders. Barton therefore does not challenge their validity in this Status Report.

8. On December 2, 2025, the Receiver filed Dkt. 189 indicating an intention to seek a final decree and closure of this case. Barton thereafter filed Dkts. 193 and 194. Before the hearing on Dkt. 193, Barton also filed Dkt. 199 requesting that the United States Trustee state its position concerning any proposed final decree or case closure. The Court denied Dkt. 193 on April 10, 2026. The docket presently reflects no separate order disposing of Dkt. 199 and no filed statement of position from the United States Trustee responding to Dkt. 199. Barton does not seek reconsideration of the order denying Dkt. 193.

9. No motion for final decree is presently pending, no final decree has been entered, and this Chapter 11 case remains open. On August 27, 2026, the Courtroom Deputy requested a further status update.

## II. THE CONFIRMED PLAN ESTABLISHES THE RELEVANT PAYMENT OBLIGATIONS

10. Dkt. 79 materially modified the Plan before confirmation. It states:

"The Plan will pay all Allowed Claimants 100% of their Claims." Dkt. 79 § 2.02.

11. Dkt. 79 further provides that Allowed Professional Fee Administrative Claims are to be "paid in full, in Cash" in the amounts allowed by this Court on the later of the Effective Date or the date the allowance order becomes final, absent different agreed treatment. Dkt. 79 at 2–3.

12. As finally modified by Dkt. 100, the treatment of non-insider Allowed General Unsecured Claims is equally explicit:

> "Each Class 2 Claim shall be paid in full on or before the Effective Date, or if a Class 2 Claim has not been Allowed as of the Effective Date, such Class 2 Claim shall be paid in full within five (5) days of the date on which such Class 2 Claim becomes Allowed." Dkt. 100 at 3.

13. The Plan also expressly preserved BM318's causes of action, including claims recoverable under § 550, "for enforcement by the Reorganized Debtor for the benefit of the Creditors subsequent to the Effective Date." Dkt. 79 § 8.01. Dkt. 79 specifically reserved BM318's causes of action against Dixon.

14. The Plan provides that all payments and distributions under the Plan are to be made by the Reorganized Debtor. Plan § 10.07. It also expressly retained this Court's jurisdiction to resolve disputes concerning Plan interpretation and to "implement and enforce" the Plan. Plan §§ 12.03–12.04.

## III. THE RECEIVER'S OWN REPORT IDENTIFIES THE BM318 SETTLEMENT RECEIPTS IN THE MAIN RECEIVERSHIP ACCOUNT

15. The approved Dixon settlement did not describe the $100,000 consideration as payment to a general receivership fund. Dkt. 147 identified the material settlement term as:

> "Payment by Dixon to BM318 of $100,000.00." Dkt. 147 at 4.

16. Dkt. 147 further represented that the compromise was in the best interest of "BM318, as the Reorganized Debtor, and its creditors," and relied upon Plan § 8.01 as BM318's authority to resolve the preserved claims.

17. Likewise, Dkt. 149 provided for:

"A payment by Lumar to BM318 of $75,000.00." Dkt. 149 at 6.

18. Dkt. 149 likewise represented that the settlement was in the best interest of BM318 as Reorganized Debtor and its creditors and relied upon Plan § 8.01. Thus, the two approved agreements expressly made $175,000 payable to BM318.

19. The Receiver subsequently reported these settlement receipts in the separate Receivership Case.

20. In the Receiver's Ninth Quarterly Status Report filed in Securities and Exchange Commission v. Timothy Barton, et al., No. 3:22-cv-02118-X, Dkt. 583 at 61 (N.D. Tex. filed Oct. 30, 2024), the Receiver reported a $100,000 Dixon settlement payment and a $75,000 Lumar settlement payment during the third quarter of 2024. Relevant excerpts from Dkt. 583 and its attached cash accounting are submitted as Exhibit A.

21. The Receiver placed both receipts under the heading "Deposits into Main Receivership Account." Receivership Case, Dkt. 583 at 61.

22. The Receiver's attached cash accounting supplies the exact transaction entries:

a. August 19, 2024 — DDA Regular Deposit — "Dixon Settlement" — $100,000.00;

b. August 21, 2024 — Wire Transfer Credit — "Lumar Settlement" — $75,000.00.

Receivership Case, Dkt. 583-1 at 6.

23. Those entries identify the starting point for the required accounting: settlement proceeds expressly payable to BM318 entered the pooled Main Receivership Account. The Receiver's report does not provide the corresponding BM318-specific ledger, subledger, or reconciliation showing the disposition and Plan treatment of those funds after deposit.

## IV. THE RECEIVER'S AGGREGATED REPORTING DOES NOT PROVIDE A BM318-SPECIFIC RECONCILIATION

24. Whether the use of a centralized receivership bank account was permissible or appropriate is not the question presented by this Status Report. The relevant question is whether the accounting preserved BM318's entity-level ownership, liabilities, and Plan obligations after BM318's settlement consideration entered that pooled account.

25. The Receiver controls BM318 and the records necessary to answer that question. An aggregated receivership cash report is not a substitute for the BM318-specific accounting necessary to show how BM318 property was credited, charged, transferred, distributed, and ultimately treated under this Court's confirmed Plan.

26. The bankruptcy docket presently does not contain a reconciliation showing:

a. the accounting entry by which the $100,000 Dixon receipt was credited to BM318;

b. the accounting entry by which the $75,000 Lumar receipt was credited to BM318;

c. BM318's resulting entity-level balance;

d. any transfer of BM318 value thereafter to another Receivership Entity, receivership account, professional, or recipient;

e. any administrative or professional expenses charged against BM318;

f. distributions made on BM318's Allowed Administrative Claims;

g. distributions made on BM318's Allowed Class 2 Claims;

h. the remaining unpaid balance of each such claim; or

i. the amount, if any, presently attributable to BM318.

27. The need for an entity-level reconciliation is particularly material because, during the same quarter, the Receiver reported $464,215.53 in disbursements from the Main Receivership Account, including $437,741.03 in payments to the Receiver and his professionals pursuant to an approved fee application. Securities and Exchange Commission v. Timothy Barton, et al., No. 3:22-cv-02118-X, Dkt. 583 at 62 (N.D. Tex. filed Oct. 30, 2024). The report does not identify a BM318-specific allocation of those disbursements or show, by BM318 ledger, what creditor or administrative obligations of BM318 were paid.

28. This Status Report does not ask the Court to infer from timing alone that the Dixon or Lumar settlement dollars funded any particular professional payment. The pooling of receipts and disbursements makes the entity-level ledger more important, not less, because that ledger is the record that can identify what was charged to BM318 and what remained attributable to BM318.

29. Without that BM318-specific ledger or equivalent reconciliation, the bankruptcy docket does not permit this Court to determine whether the $175,000 remained credited to BM318, what BM318 obligations were paid, what transfers or expenses were charged against BM318, or whether the confirmed Plan was performed.

## V. DKT. 135 PROVIDES A CONCRETE EXAMPLE OF AN EXISTING PLAN OBLIGATION

30. The issue is not hypothetical.

31. On April 5, 2022, this Court entered Dkt. 135 approving, in part, the final fee application of Joyce W. Lindauer Attorney, PLLC.

32. Dkt. 135 awarded $34,326.41, consisting of $31,869.25 in compensation and $2,457.16 in expenses, "as an allowed administrative claim in this case to be paid by the Debtor and its estate."

33. That order directly implicates Dkt. 79's requirement that Allowed Professional Fee Administrative Claims be paid in full in cash.

34. More than two years later, immediately before settlement approval, Lindauer filed Dkt. 153 on May 16, 2024 and represented to this Court:

> "Counsel has approved fees in the Bankruptcy Case that have not been paid." Dkt. 153 at 1.

35. Dkt. 153 therefore provides contemporaneous record evidence that at least one specific, court-allowed BM318 administrative obligation remained unpaid immediately before the Dixon and Lumar settlements were approved.

36. Barton does not ask the Court in this Status Report to determine the present amount owing to Lindauer, nor does Barton rely upon Lindauer's separate asserted post-confirmation adversary fees as an Allowed Claim. The narrow point is that Dkt. 135 establishes the allowed claim, and Dkt. 153 establishes that the court-approved fees remained unpaid as of May 16, 2024.

37. The existing record does not establish whether Dkt. 135 was subsequently paid after the Receiver received the $175,000. A verified Plan reconciliation can answer that straightforward factual question. In addition, Invoice No. 36712 issued to BM318 by Joyce W. Lindauer Attorney, PLLC on August 31, 2026 reflects a previous balance of $116,064.01, $4,739.50 in professional services, and a stated balance due of $120,803.51. See Ex. B, Invoice No. 36712 at

2. The invoice does not segregate the Dkt. 135 Allowed Administrative Claim from other asserted fees; it therefore reinforces the need for the Receiver's reconciliation to identify specifically whether, when, and from what source the Dkt. 135 claim was paid.

## VI. THE RECEIVERSHIP'S GENERAL CLAIMS PROCESS DOES NOT, WITHOUT IDENTIFIED AUTHORITY, ANSWER THE BM318 PLAN QUESTION

38. In the same Ninth Quarterly Status Report, the Receiver stated that, as of October 30, 2024, he "has not yet filed a Motion for Order Establishing Claims Adjudication Process." Receivership Case, Dkt. 583 at 80.

39. The Receiver further stated that he intended later to establish an investor-and-creditor claims process and "eventually make distributions pursuant to a Court-approved distribution plan." Receivership Case, Dkt. 583 at 81.

40. That remained the Receiver's stated posture in subsequent quarterly reports into 2025.

41. BM318, however, was already operating under a separately confirmed Chapter 11 Plan entered by this Court.

42. Nothing identified on this bankruptcy docket reflects an order modifying Dkt. 79's treatment of Allowed Administrative Claims, Dkt. 100's treatment of Class 2 Claims, or Plan § 8.01's preservation of BM318's causes of action for the benefit of creditors.

43. If the Receiver contends that BM318's creditors ceased to be governed by the confirmed Plan and instead became subject exclusively to a later general receivership claims process, the appropriate closure record should identify the precise order and legal authority producing that result.

44. Likewise, if all BM318 Plan obligations were already satisfied before the $175,000 was received, a verified reconciliation should establish that fact and end the inquiry.

## VII. THIS STATUS REPORT DOES NOT SEEK TO REVISIT THE SETTLEMENT ORDERS OR THE RECEIVERSHIP

45. The requested accounting concerns implementation of this Court's confirmed Plan and Settlement Orders after the Receiver received BM318 settlement proceeds.

46. This Court's November 20, 2024 ruling, reflected at Dkt. 185, recognized the finality of the Settlement Orders and the Receiver's authority to act on behalf of BM318 for purposes of those settlements. This Court also retained jurisdiction to construe and enforce its Settlement Orders.

47. This Status Report does not seek reconsideration of those rulings.

48. Barton does not purport to act on behalf of BM318 in this filing and does not seek to invalidate Dkts. 163 or 164. The requested status accounting concerns what the Receiver did with BM318's settlement proceeds after the settlements were approved and consummated.

49. The status question is whether the Receiver's administration of BM318 can be reconciled to BM318's confirmed Plan and this Court's orders through an entity-level accounting of the settlement receipts, charges, transfers, creditor payments, and remaining balance.

50. That is a Plan-implementation and accounting question; it does not require the Court to revisit the merits of the settlements themselves.

## VIII. THIS COURT RETAINS AUTHORITY TO REQUIRE A PLAN-IMPLEMENTATION RECORD

51. Section 1141(a) makes a confirmed plan binding upon the debtor and affected creditors.

52. Section 1142(a) requires the debtor and entities organized or required to carry out the Plan to perform it, and § 1142(b) authorizes the Court to direct the debtor and any other necessary party to perform acts necessary for consummation of the Plan.

53. The Fifth Circuit recognizes post-confirmation jurisdiction over matters concerning the implementation or execution of a confirmed plan. In re U.S. Brass Corp., 301 F.3d 296, 304–05 (5th Cir. 2002).

54. Where a dispute concerns compliance with or completion of a confirmed plan, the required post-confirmation nexus exists. Id. at 305.

55. BM318's Plan independently retains this Court's jurisdiction to interpret and enforce the Plan. Plan §§ 12.03–12.04.

56. Bankruptcy Rule 3022 provides for entry of a final decree after an estate has been fully administered.

57. Barton recognizes that Rule 3022 does not require completion of every conceivable future payment in every Chapter 11 case before closure. The circumstance here is different. The Plan imposed specific payment obligations, an Allowed Administrative Claim remained unpaid immediately before settlement approval, $175,000 was later received for BM318, and the present bankruptcy record does not reconcile those events.

## IX. THE COURT'S CURRENT STATUS INQUIRY REQUIRES A BM318-SPECIFIC STATUS ACCOUNTING

58. On April 10, 2026, the Court denied Dkt. 193 on the ground that no pending dispute or controversy was then before the Court and, on that basis, concluded that it lacked jurisdiction to grant the requested relief. Barton does not seek reconsideration of that order.

59. The Court thereafter requested a current status update on August 27, 2026. In responding to that request, the material status issue is that the Receiver controls BM318's books and records, while the bankruptcy docket does not contain a BM318-specific reconciliation of the settlement receipts, creditor distributions, charges, transfers, and remaining balance.

60. The Receiver's separate Receivership Case reporting confirms that BM318 settlement receipts were placed into the Main Receivership Account, but the reporting is aggregated at the receivership level and does not supply the entity-level accounting necessary to determine BM318's Plan status.

61. An accurate status determination therefore requires the Receiver, as the person controlling BM318 and its accounting records, to identify how BM318's settlement value was credited and administered and whether BM318's confirmed Plan obligations were paid.

62. A verified BM318-specific reconciliation is the appropriate record for the Court's present status inquiry and for any later determination whether BM318 has been fully administered under Bankruptcy Rule 3022.

## X. REQUESTED PROCEDURAL DIRECTION

63. The Court's current status inquiry cannot be completed from the bankruptcy docket alone because the Receiver controls BM318 and the records necessary to show BM318's entity-level administration.

64. Barton respectfully requests that the Court direct the Receiver, in connection with the current status inquiry, to file a verified BM318-specific Plan-implementation reconciliation supported by the relevant bank and accounting records. Alternatively, if the Court elects not to require that filing at this time, Barton respectfully requests that any future motion for

entry of a final decree or other closure be accompanied by that reconciliation. The reconciliation should identify:

a. the August 19, 2024 $100,000 Dixon settlement receipt;

b. the August 21, 2024 $75,000 Lumar settlement receipt;

c. the ledger entry or subledger entry crediting each receipt to BM318;

d. BM318's entity-level balance immediately before and immediately after those receipts;

e. each transfer thereafter of value attributable to BM318 to another receivership account, Receivership Entity, professional, creditor, or other recipient, including the date, amount, purpose, and authority for each transfer;

f. each material expense charged to BM318;

g. the status of the $34,326.41 Allowed Administrative Claim established by Dkt. 135, including the amount and date of any payment and the current unpaid balance, if any; See also Ex. B, Invoice No. 36712 at 2; the reconciliation should state whether any payment on the Dkt. 135 claim is reflected in the current Lindauer account balance.

h. a creditor-by-creditor schedule for BM318 identifying each Allowed Class 2 Claim, its allowed amount, payments made, dates and sources of payment, and remaining balance;

i. the status of all other Allowed Administrative Claims;

j. each BM318 bank account, subaccount, or other accounting mechanism used after confirmation, including the disposition of any balance when an account was closed;

k. the present cash or other value, if any, attributable to BM318;

l. the status of the quarterly reports and United States Trustee fees required by Dkt. 106; and

m. the precise bankruptcy or District Court order relied upon for any treatment of BM318 settlement proceeds inconsistent with, or different from, the confirmed Plan.

65. After the Receiver files the verified reconciliation, or if the same is filed with a future closure request, Barton respectfully requests that:

a. the United States Trustee be afforded an opportunity to state its position concerning compliance with Dkt. 106 and implementation of the confirmed Plan;

b. interested parties be permitted a reasonable period to respond;

c. the Court conduct a status conference if necessary; and

d. the Court then determine whether BM318 has been fully administered for purposes of Rule 3022 or whether further implementation relief under 11 U.S.C. § 1142 is necessary.

66. Barton does not presently request an adjudication of damages or personal liability against the Receiver. If the accounting demonstrates that further Plan-implementation relief is necessary, any such relief can be addressed on the developed record under the Bankruptcy Code and applicable procedure.

## XI. CONCLUSION

67. BM318's confirmed Plan establishes concrete payment and reporting obligations and preserves BM318's causes of action for enforcement by the Reorganized Debtor for the benefit of creditors.

68. The Dixon and Lumar settlements generated $175,000 expressly payable to BM318, and the Receiver's separate Receivership Case reporting identifies those receipts in the Main Receivership Account.

69. The Receiver's aggregated reporting does not provide the corresponding BM318-specific ledger showing how those receipts were credited, what charges or transfers were allocated to BM318, what BM318 creditors or administrative claims were paid, or what balance remains attributable to BM318.

70. Dkt. 135 establishes a $34,326.41 Allowed Administrative Claim of Joyce W. Lindauer Attorney, PLLC, and Dkt. 153 provides contemporaneous record evidence that court-approved bankruptcy fees remained unpaid immediately before the settlements were approved. Exhibit B further reflects that, as of August 31, 2026, Lindauer continued to state a balance due from BM318 of $120,803.51, although the invoice does not segregate the Dkt. 135 allowed amount from other asserted fees.

71. Without the Receiver's BM318-specific reconciliation, the bankruptcy docket does not provide a sufficient record to determine whether the confirmed Plan has been performed or whether BM318 has been fully administered.

72. The requested accounting is directed to the Receiver because he controls BM318 and the records necessary to answer these questions. It does not require reconsideration of the Settlement Orders or a determination in this Status Report concerning the propriety of the Receivership's pooled-account structure.

73. Barton therefore respectfully requests the procedural direction set out below.

WHEREFORE, Timothy L. Barton respectfully requests that the Court:

1. accept this Status Report in response to the Court's August 27, 2026 status request;

2. direct the Receiver, as the person controlling BM318 and its books and records, to file a verified BM318-specific Plan-implementation reconciliation addressing the matters identified in paragraph 64;

3. alternatively, if the Court elects not to require the reconciliation during the present status inquiry, require that any future request for entry of a final decree or other closure be accompanied by that verified BM318-specific reconciliation;

4. after the reconciliation is filed, afford the United States Trustee and other interested parties an opportunity to state their positions concerning Plan implementation and full administration;

5. set such status conference or briefing procedure as the Court deems appropriate;

6. reserve any further request for relief under 11 U.S.C. § 1142 or other applicable authority until the accounting record is complete; and

7. grant such other and further procedural relief as the Court determines appropriate.

Respectfully submitted,

Dated: September 1, 2026

/s/ Timothy L. Barton
**Timothy L. Barton, Pro Se**
1846 East Rosemeade Parkway, #232
Carrollton, Texas 75007
Telephone: (214) 914-3811
timothy.barton@proton.me

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2026, I electronically filed the foregoing Status Report of Timothy L. Barton in Response to the Court's August 27, 2026 Status Request with the Clerk of the United States Bankruptcy Court for the Northern District of Texas using the Court's CM/ECF system, which will send notice of such filing to all counsel of record and other registered ECF participants entitled to electronic notice in this case

/s/ Timothy L. Barton
**Timothy L. Barton, Pro Se**

# EXHIBIT A

Relevant Excerpts from Receiver's Ninth Quarterly Status Report

Securities and Exchange Commission v. Timothy Barton, et al.

No. 3:22-cv-02118-X (N.D. Tex.)

Dkt. 583 and Dkt. 583-1

Filed October 30, 2024

of the Receiver and his professionals' unpaid fees, combined with the large amount of work that has been required to maintain the receivership, these outstanding liabilities are extensive.

**A. Description of Recoveries from Third Quarter of 2024**

**1. Deposits into Main Receivership Account**

Between July 1, 2024, and September 30, 2024, the Receiver deposited $295,912.64[25] into the Main Receivership Account, comprised of the following:

Dixon Settlement Payment. During the Third Quarter of 2024, the Dixon Water Foundation made a settlement payment of $100,000.00 under its settlement agreement with the Receiver.

Lumar Settlement Payment. During the Third Quarter of 2024, Lumar made a settlement payment of $75,000.00 under its settlement agreement with the Receiver.

Tamamoi Settlement Payment. During the Third Quarter of 2024, Tamamoi made a settlement payment of $75,000.00 under its settlement agreement with the Receiver.

Killeen Payment. During the Third Quarter of 2024, the Receiver deposited $40,500.00 representing the Receivership's share of a surplus cash distribution related to the Killeen development.

Interest Deposits. During the Third Quarter of 2024, the Receiver received a total of $5,412.44 in interest payments.

Other Miscellaneous Deposits. During the Third Quarter of 2024, the Receiver also deposited $1,648.43 related to a refund from the City of Dallas related to prior water payments on the Gillespie property.

---

[25] Total Receipts during the Third Quarter of 2024 totaled $297,560.87 when including the refund from the City of Dallas described below.

### 2. Deposits into Amerigold Suites Account

Between July 1, 2024, and September 30, 2024, the Amerigold Suites generated $182,857.52 in gross rental income.

### 3. Deposits into D4OP LLC Account

Between July 1, 2024, and September 30, 2024, the Receiver did not deposit any funds into the D4OP LLC account held at Veritex.

## B. Description of Disbursements from Third Quarter of 2024

### 1. Disbursements from Main Receivership Account

Between July 1, 2024, and September 30, 2024, the Receivership spent $464,215.53 from the Main Receivership Account, comprised of the following:

Utility Fees. The Receiver paid $45.90 to Dallas Water Utilities related to water and sewage at Gillespie during the Quarter.

Landscaping. During the Third Quarter of 2024, the Receiver paid $3,100.00 to landscapers related to mowing at the Gillespie, Hall, Frisco, and Ridgeview Properties.

Insurance. During the Third Quarter of 2024, the Receiver paid $2,517.63 related to insurance for the Gillespie Property.

IT Expenses. Because the Receiver has been unable to pay his professionals for any time spent on this matter since April 1, 2023, the Receiver has been forced to incur certain expenses directly. During the Third Quarter of 2024, this included charges related to data hosting (of the Defendants email servers), totaling $1,408.11.

Payments to Professionals. In accordance with the Court's approval of the Receiver's Third Fee Application [Dkt. 553], the Receiver paid a total of $437,741.03 relating to professional fees and expenses incurred during the Second Quarter of 2023 (the third quarter of the Receivership).

learning of the proceeding, the Receiver filed a notice of stay, and the Court ordered the case be administratively closed.

*No new updates from Third Quarter of 2024.*

## V.
## STATUS OF CLAIMS PROCEEDINGS FOR INVESTORS AND CREDITORS

The Receiver has not yet filed a Motion for Order Establishing Claims Adjudication Process.

### A. Wall Investors

On November 7, 2022, the Receiver sent letters to approximately 100 investors who had previously been identified as potential investors in Wall Entities. The letters also included a request for information. This letter and request for information were also posted to the Receivership Website. Dozens of the investors have completed the information forms. If a claims process is initiated, the Receiver anticipates receiving additional information from these investors, other Wall investors, and other creditors. Through the forensic accounting process, the Receiver will continue to identify and cross-reference potential investors in the Wall Entities.

### B. Other Investors and Creditors

In addition to investors in the Wall Entities, the Receiver has continued identifying other lenders, equity investors, and creditors (both secured and unsecured) of the Receivership Entities. While the Receiver's efforts to date have focused primarily upon identifying investors and assets, dozens of creditors have already been identified, and the Receiver anticipates receiving many more creditor claims when the Court commences a claims process.

## VI.
## PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

The next immediate steps for administration of the Receivership include (1) continuing to secure and maintain the assets of the Receivership, including, liquidating assets of the Receivership

Case 3:22-cv-02118-X Document 583 Filed 10/30/24 Page 81 of 82 PageID 19522

where necessary to preserve and maximize their value; (2) completing a forensic accounting of the Receivership's bank accounts to (a) determine the amount of monies flowing into the Wall Entities from investors, (b) trace where those monies ultimately flowed, and (c) identify potential fraudulent transfers and transferees; and (3) completing the identification of investors in the Wall Entities.

The forensic accounting will greatly aid the Receiver in determining whether the Receivership Estate has other assets that have not yet been discovered. Because the Receiver has received limited information from Defendant Barton to date, the forensic accounting will likely be the best means of determining where investor monies flowed.

## VII.
## RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

This is the ninth report from the Receiver and extensive work still remains. More specifically, the Receiver intends to (1) continue securing, maintaining, and selling assets; (2) continue pursuing potential fraudulent conveyances; (3) continue investigating potential damages claims against third parties; (4) petition the Court to establish an investor and creditor claims process; and, (5) upon a determination of liability, agreement of Defendants, or further order of this Court, eventually make distributions pursuant to a Court-approved distribution plan. Accordingly, the Receiver recommends that the Receivership continue.

**Barton Receivership Account**
**Cash Accounting Summary**
**July 1, 2024 through September 30, 2024**

## Cash Receipts

| Date | Item Description | Cash Receipts 3Q24 | Cash Receipts 4Q22 to present |
|---|---|---|---|
| 12/31/2022 | Cash Receipts 4Q22 | | $819,171.90 |
| 03/31/2023 | Cash Receipts 1Q23 | | $129,887.29 |
| 06/30/2023 | Cash Receipts 2Q23 | | $622,543.82 |
| 09/30/2023 | Cash Receipts 3Q23 | | $4,988.77 |
| 12/31/2023 | Cash Receipts 4Q23 | | $14,056.20 |
| 03/31/2024 | Cash Receipts 1Q24 | | $8,528.09 |
| 06/30/2024 | Cash Receipts 2Q24 | | $794,468.89 |
| 07/25/2024 | DDA Regular Deposit (Gillespie Water Refund) | $1,648.43 | |
| 07/31/2024 | Wire Transfer Credit (NMP-Killeen Surplus Cash Distrib.) | $40,500.00 | |
| 07/31/2024 | Interest Deposit | $2,193.73 | |
| 08/19/2024 | DDA Regular Deposit (Dixon Settlement) | $100,000.00 | |
| 08/21/2024 | Wire Transfer Credit (Lumar Settlement) | $75,000.00 | |
| 08/30/2024 | Wire Transfer Credit (Tamamoi Settlement) | $75,000.00 | |
| 09/02/2024 | Interest Deposit | $1,796.03 | |
| 09/30/2024 | Interest Deposit | $1,422.68 | |
| **TOTAL RECEIPTS 3Q24** | | **$297,560.87** | |
| **TOTAL RECEIPTS RECEIVERSHIP** | | | **$2,691,205.83** |

# EXHIBIT B

Joyce W. Lindauer Attorney, PLLC

Invoice No. 36712 to BM318 LLC

Dated August 31, 2026

JOYCE W. LINDAUER ATTORNEY, PLLC
Lindauer & Vaughn, Attorneys At Law
117 S Dallas St
Ennis, TX 75119

Invoice submitted to:
BM318 LLC
Via Email:
accounting@jmjdevelopment.com;
bills@jmjdevelopment.com;
tbarton@jmjdevelopment.com;
mvenkat@jmjdevelopment.com

August 31, 2026
In Reference To:

Invoice # 36712

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 1/25/2024 | JWL | Attend status hearing | 0.50<br>495.00/hr | 247.50 |
| | SAO | Attend status hearing. | 0.30<br>295.00/hr | 88.50 |
| 3/28/2024 | JWL | Attend status hearing. | 0.30<br>495.00/hr | 148.50 |
| 5/16/2024 | DHG | Work on objection to settlement motions (.3); finalize and file same (.2) | 0.50<br>225.00/hr | 112.50 |
| 5/17/2024 | SAO | Made exhibit binders | 0.50<br>295.00/hr | 147.50 |
| 5/20/2024 | JWL | Attend hearing on 9019 motions | 3.50<br>495.00/hr | 1,732.50 |
| 5/22/2024 | JWL | Object to settlements | 1.50<br>495.00/hr | 742.50 |
| 5/29/2024 | JWL | Work on orders for appeal | 0.30<br>495.00/hr | 148.50 |
| 7/29/2024 | JWL | Work on BM318 response and affidavit | 0.50<br>550.00/hr | 275.00 |

BM318 LLC



| Date | Timekeeper | Description | Hrs/Rate | Amount |
|---|---|---|---|---|
| 7/29/2024 | DHG | Review and revise affidavit of Joyce Lindauer re: BM318 settlement with Dixon Water Foundation | 1.00<br>225.00/hr | 225.00 |
| 9/6/2024 | DHG | Revise notice of appeal | 0.20<br>225.00/hr | 45.00 |
| 9/10/2024 | DHG | Prepare amended notice of appeal | 0.50<br>225.00/hr | 112.50 |
| 11/12/2024 | JWL | attend BM 318 hearing | 1.20<br>595.00/hr | 714.00 |
| | | For professional services rendered | 10.80 | $4,739.50 |
| | | Previous balance | | $116,064.01 |
| | | Balance due | | $120,803.51 |

Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Dian Gwinnup | 2.20 | 225.00 | $495.00 |
| Joyce W. Lindauer | 1.20 | 595.00 | $714.00 |
| Joyce W. Lindauer | 0.50 | 550.00 | $275.00 |
| Joyce W. Lindauer | 6.10 | 495.00 | $3,019.50 |
| Sydney Ollar | 0.80 | 295.00 | $236.00 |

OFFICE PHONE: (972) 875-2565

TO PAY BY CREDIT OR DEBIT, please CALL, MAIL or EMAIL (admin@joycelindauer.com). Include the following:

AMOUNT AUTHORIZED________________________ CARD SECURITY CODE ______________

NAME ON CARD ________________________ SIGNATURE ______________________

CARD NUMBER ________________________ BILLING ZIP CODE__________________

EXPIRATION DATE ________________________ TODAY'S DATE __________________